dotloop signature verification

# PURCHASE AND SALE AGREEMENT

Offer Date: 06/20/2019



Georgia REALTORS

**2019 Printing**

## A. KEY TERMS AND CONDITIONS

1. **Purchase and Sale.** The undersigned buyer(s) ("Buyer") agree to buy and the undersigned seller(s) ("Seller") agree to sell the real property described below including all fixtures, improvements and landscaping therein ("Property") on the terms and conditions set forth in this Agreement.
   a. Property Identification: Address: 1196 Dekalb Avenue NE
   City Atlanta, County Dekalb, Georgia, Zip Code 30307
   MLS Number: 6122275    Tax Parcel I.D. Number: 15-209-04-227
   b. Legal Description: The legal description of the Property is (select one of the following below):
   ☐ (1) attached as an exhibit hereto;
   ☐ (2) Condominium (attach F204 Condominium Resale Purchase and Sale Exhibit)
   ☑ (3) the same as described in Deed Book 5127, Page 715, et. seq., of the land records of the above county; OR
   ☐ (4) Land Lot(s) _____ of the _____ District, _____ Section/GMD
   Lot _____, Block _____, Unit _____, Phase/Section _____
   of _____ Subdivision/Development, according
   to the plat recorded in Plat Book _____, Page _____, et. seq., of the land records of the above county.

2. **Purchase Price of Property to be Paid by Buyer.**
   $ 486,000.00

3. **Closing Costs.**
   Seller's Contribution at Closing: $ 0.00

4. **Closing Date and Possession.**
   Closing Date shall be 07/22/2019 _____ with possession of the Property transferred to Buyer
   ☑ at Closing OR ☐ _____ days after Closing at _____ o'clock ☐ AM ☐ PM (attach F219 Temporary Occupancy Agreement).

5. **Holder of Earnest Money ("Holder").** (If Holder is Closing Attorney, F510 must be attached as an exhibit hereto, and F511 must be signed by Closing Attorney.)
   Keller Williams Realty Cityside

6. **Closing Attorney/Law Firm.**
   Raimondi & Associates LLC - Glenridge Location

7. **Earnest Money.** Earnest Money shall be paid by ☑ check ☐ cash or ☐ wire transfer of immediately available funds as follows:
   ☐ a. $ _____ as of the Offer Date.
   ☑ b. $20,000.00 within 3 days from the Binding Agreement Date.
   ☐ c.

8. **Inspection and Due Diligence.**
   a. Due Diligence Period: Property is being sold subject to a Due Diligence Period of ZERO days from the Binding Agreement Date.
   b. Option Payment for Due Diligence Period: In consideration of Seller granting Buyer the option to terminate this Agreement, Buyer:
   (1) has paid Seller $10.00 in nonrefundable option money, the receipt and sufficiency of which is hereby acknowledged, plus
   (2) shall pay Seller additional option money of $ _____ by ☐ check or ☐ wire transfer of immediately available funds either ☐ as of the Offer Date; OR ☐ within _____ days from the Binding Agreement Date. Any additional option money paid by Buyer to Seller ☐ shall (subject to lender approval) or ☐ shall not be applied toward the purchase price at closing and shall not be refundable to Buyer unless the closing fails to occur due to the default of the Seller.

9. **Lead-Based Paint.** To the best of Seller's knowledge, the residential dwelling(s) on the Property (including any portion thereof or painted fixture therein) ☑ was (attach F316 Lead-Based Paint Exhibit) OR ☐ was not built prior to 1978.

10. **Brokerage Relationships in this Transaction.**
    a. Selling Broker is Keller Williams Realty Cityside _____ and is:
    (1) ☑ representing Buyer as a client
    (2) ☐ working with Buyer as a customer.
    (3) ☐ acting as a dual agent representing Buyer and Seller.
    (4) ☐ acting as a designated agent where:
    _____ has been assigned to exclusively represent Buyer.

    b. Listing Broker is RE/MAX Around Atlanta Realty _____ and is:
    (1) ☑ representing Seller as a client
    (2) ☐ working with Seller as a customer
    (3) ☐ acting as a dual agent representing Buyer and Seller.
    (4) ☐ acting as a designated agent where
    _____ has been assigned to exclusively represent Seller

    c. **Material Relationship Disclosure:** The material relationships required to be disclosed by either Broker are as follows:
    NONE

11. **Time Limit of Offer.** The Offer set forth herein expires at 5 o'clock p.m. on the date 06/21/2019

Buyer(s) Initials _____    Seller(s) Initials _____

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Melanie Smith IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS AT (770) 451-1831.
Copyright© 2019 by Georgia Association of REALTORS®, Inc.    F201, Purchase and Sale Agreement, Page 1 of 8, 06/01/19

B. CORRESPONDING PARAGRAPHS FOR SECTION A

1. Purchase and Sale.
   a. **Warranty:** Seller warrants that at the time of closing Seller will convey good and marketable title to said Property by limited warranty deed subject only to: (1) zoning; (2) general utility, sewer, and drainage easements of record as of the Binding Agreement Date and upon which the improvements do not encroach; (3) declarations of condominium and declarations of covenants, conditions and restrictions of record on the Binding Agreement Date; and (4) leases and other encumbrances specified in this Agreement. Buyer agrees to assume Seller's responsibilities in any leases specified in this Agreement.
   b. **Examination:** Buyer may examine title and obtain a survey of the Property and furnish Seller with a written statement of title objections at or prior to the closing. If Seller fails or is unable to satisfy valid title objections at or prior to the closing or any unilateral extension thereof, which would prevent the Seller from conveying good and marketable title to the Property, then Buyer, among its other remedies, may terminate the Agreement without penalty upon written notice to Seller. Good and marketable title as used herein shall mean title which a title insurance company licensed to do business in Georgia will insure at its regular rates, subject only to standard exceptions.
   c. **Title Insurance:** Buyer hereby directs any mortgage lender involved in this transaction to quote the cost of title insurance based upon the presumption that Buyer will be obtaining an enhanced title insurance policy since such a policy affords Buyer greater coverage.

2. **Purchase Price to be Paid by Buyer.** The Purchase Price shall be paid in U.S. Dollars at closing by wire transfer of immediately available funds, or such other form of payment acceptable to the closing attorney.

3. Closing Costs.
   a. **Seller's Contribution at Closing:** At closing, Seller shall make the referenced Seller's Monetary Contribution which Buyer may use to pay any cost or expense of Buyer related to this transaction. Buyer acknowledges that Buyer's mortgage lender(s) may not allow the Seller's Monetary Contribution, or the full amount thereof, to be used for some costs or expenses. In such event, any unused portion of the Seller's Monetary Contribution shall remain the property of the Seller. The Seller shall pay the fees and costs of the closing attorney: (1) to prepare and record title curative documents and (2) for Seller not attending the closing in person.
   b. **Items Paid by Buyer:** At closing, Buyer shall pay: (1) Georgia property transfer tax; (2) the cost to search title and tax records and prepare the limited warranty deed; and (3) all other costs, fees and charges to close this transaction, except as otherwise provided herein.
   c. **Prorations:** Ad valorem property taxes, community association fees, solid waste and governmental fees and utility bills for which service cannot be terminated as of the date of closing shall be prorated as of the date of closing. In the event ad valorem property taxes are based upon an estimated tax bill or tax bill under appeal, Buyer and Seller shall, upon the issuance of the actual tax bill or the appeal being resolved, promptly make such financial adjustments between themselves as are necessary to correctly prorate the tax bill. In the event there are tax savings resulting from a tax appeal, third party professional costs to handle the appeal may be deducted from the savings for that tax year before re-prorating. Any pending tax appeal for the year in which the Property is sold shall be deemed assigned to Buyer at closing.

4. Closing Date and Possession.
   a. **Right to Extend the Closing Date:** Buyer or Seller may unilaterally extend the closing date for eight (8) days upon notice to the other party given prior to or on the date of closing if: (1) Seller cannot satisfy valid title objections (excluding title objections that: (a) can be satisfied through the payment of money or by bonding off the same; and (b) do not prevent Seller from conveying good and marketable title, as that term is defined herein, to the Property); (2) Buyer's mortgage lender (even in "all cash" transactions where Buyer is obtaining a mortgage loan) or the closing attorney is delayed and cannot fulfill their respective obligations by the date of closing, provided that the delay is not caused by Buyer; or (3) Buyer has not received required estimates or disclosures and Buyer is prohibited from closing under federal regulations. The party unilaterally extending the closing date shall state the basis for the delay in the notice of extension. If the right to unilaterally extend the closing date is exercised once by either the Buyer or Seller, the right shall thereafter terminate.
   b. **Keys and Openers:** At Closing, Seller shall provide Buyer with all keys, door openers, codes and other similar equipment pertaining to the Property.

5. **Holder of Earnest Money.** The earnest money shall be deposited into Holder's escrow/trust account (with Holder being permitted to retain the interest if the account is interest bearing) not later than: (a) five (5) banking days after the Binding Agreement Date hereunder or (b) five (5) banking days after the date it is actually received if it is received after the Binding Agreement Date. If Buyer writes a check for earnest money and the same is deposited into Holder's escrow/trust account, Holder shall not return the earnest money until the check has cleared the account on which the check was written. In the event any earnest money check is dishonored by the bank upon which it is drawn, or earnest money is not timely paid, Holder shall promptly give notice of the same to Buyer and Seller. Buyer shall have three (3) banking days from the date of receiving the notice to cure the default and if Buyer does not do so, Seller may within seven (7) days thereafter terminate this Agreement upon notice to Buyer. If Seller fails to terminate the Agreement timely, Seller's right to terminate based on the default shall be waived.

6. **Closing Attorney/Law Firm.** Buyer shall have the right to select the closing attorney to close this transaction, and hereby selects the closing attorney referenced herein. In all cases where an individual closing attorney is named in this Agreement but the closing attorney is employed by or an owner, shareholder, or member in a law firm, the law firm shall be deemed to be the closing attorney. If Buyer's mortgage lender refuses to allow that closing attorney to close this transaction, Buyer shall select a different closing attorney acceptable to the mortgage lender. The closing attorney shall represent the mortgage lender in any transaction in which the Buyer obtains mortgage financing (including transactions where the method of payment referenced herein is "all cash"). In transactions where the Buyer does not obtain mortgage financing, the closing attorney shall represent the Buyer.

7. Earnest Money.
    a. **Entitlement to Earnest Money:** Subject to the paragraph below, Buyer shall be entitled to the earnest money upon the: (1) failure of the parties to enter into a binding agreement; (2) failure of any unexpired contingency or condition to which this Agreement is subject; (3) termination of this Agreement due to the default of Seller; or (4) termination of this Agreement in accordance with a specific right to terminate set forth in the Agreement. Otherwise, the earnest money shall be applied towards the purchase price of the Property at closing or if other funds are used to pay the purchase price then the earnest money shall be returned to Buyer.
    b. **Disbursement of Earnest Money:** Holder shall disburse the earnest money upon: (1) the closing of Property; (2) a subsequent written agreement of Buyer and Seller; (3) an order of a court or arbitrator having jurisdiction over any dispute involving the earnest money; or (4) the failure of the parties to enter into a binding agreement (where there is no dispute over the formation or enforceability of the Agreement). In addition, Holder may disburse the earnest money upon a reasonable interpretation of the Agreement, provided that Holder first gives all parties at least ten (10) days notice stating to whom and why the disbursement will be made. Any party may object to the proposed disbursement by giving written notice of the same to Holder within the ten (10) day notice period. Objections not timely made in writing shall be deemed waived. If Holder receives an objection and, after considering it, decides to disburse the earnest money as originally proposed, Holder may do so and send notice to the parties of Holder's action. If Holder decides to modify its proposed disbursement, Holder shall first send a new ten (10) day notice to the parties stating the rationale for the modification and to whom the disbursement will now be made. Holder shall disburse the earnest money to Seller by check in the event Holder: (1) makes a reasonable interpretation of the Agreement that the Agreement has been terminated due to Buyer's default; and (2) sends the required ten (10) day notice of the proposed disbursement to Buyer and Seller. The above-referenced check shall constitute liquidated damages in full settlement of all claims of Seller against Buyer and the Brokers in this transaction. Holder may require Seller to sign a W-9 before issuing a check to Seller for liquidated damages of $600 or more. Such liquidated damages are a reasonable pre-estimate of Seller's actual damages, which damages the parties agree are difficult to ascertain and are not a penalty.
    c. **Interpleader:** If an earnest money dispute cannot be resolved after a reasonable time, Holder may interplead the earnest money into a court of competent jurisdiction if Holder is unsure who is entitled to the earnest money. Holder shall be reimbursed for and may deduct its costs, expenses and reasonable attorney's fees from any funds interpleaded. The prevailing defendant in the interpleader lawsuit shall be entitled to collect its attorney's fees, court costs and the amount deducted by Holder to cover Holder's costs and expenses from the non-prevailing defendant.
    d. **Hold Harmless:** All parties hereby covenant and agree to: (1) indemnify and hold Holder harmless from and against all claims, injuries, suits and damages arising out of the performance by Holder of its duties; (2) not to sue Holder for any decision of Holder to disburse earnest money in accordance with this Agreement.

8. Inspection and Due Diligence.
    a. **Right to Inspect Property:** Upon prior notice to Seller, Buyer and/or Buyer's representatives shall have the right to enter the Property at Buyer's expense and at reasonable times (including immediately prior to closing) to inspect, examine, test, appraise and survey Property. Seller shall cause all utilities, systems and equipment to be on so that Buyer may complete all inspections. Buyer agrees to hold Seller and all Brokers harmless from all claims, injuries and damages relating to the exercise of these rights and shall promptly restore any portion of the Property damaged or disturbed from testing or other evaluations to a condition equal to or better than the condition it was in prior to such testing or evaluation. If Buyer is concerned that the Property may have been used as a laboratory for the production of methamphetamine, or as a dumpsite for the same, Buyer should review the National Clandestine Laboratory Register – Georgia at www.dea.gov.
    b. **Duty to Inspect Neighborhood:** In every neighborhood there are conditions which different buyers may find objectionable. Buyer shall have the sole duty to become familiar with neighborhood conditions that could affect the Property such as landfills, quarries, power lines, airports, cemeteries, prisons, stadiums, odor and noise producing activities, crime and school, land use, government and transportation maps and plans. It shall be Buyer's sole duty to become familiar with neighborhood conditions of concern to Buyer. **If Buyer is concerned about the possibility of a registered sex offender residing in a neighborhood in which Buyer is interested, Buyer should review the Georgia Violent Sex Offender Registry available on the Georgia Bureau of Investigation Website at www.gbi.georgia.gov.**
    c. **Warranties Transfer:** Seller agrees to transfer to Buyer, at closing, subject to Buyer's acceptance thereof (and at Buyer's expense, if there is any cost associated with said transfer), Seller's interest in any existing manufacturer's warranties, service contracts, termite treatment and/or repair guarantee and/or other similar warranties which, by their terms, may be transferable to Buyer.
    d. **Property Sold "As-Is" Unless this Agreement is Subject to Due Diligence Period:**
        (1) **General:** Unless the Property is being sold subject to a Due Diligence Period referenced herein, the Property shall be sold "as-is" with all faults. Even if the Property is sold "as-is" Seller is required under Georgia law to disclose to the Buyer latent or hidden defects in the Property which Seller is aware and which could not have been discovered by the Buyer upon a reasonable inspection of the property. The inclusion of a Due Diligence Period herein shall: (a) during its term make this Agreement an option contract in which Buyer may decide to proceed or not proceed with the purchase of the Property for any or no reason; and (b) be an acknowledgement by Seller that Buyer has paid separate valuable consideration of $10 for the granting of the option.
        (2) **Purpose of Due Diligence Period:** During the Due Diligence Period, Buyer shall determine whether or not to exercise Buyer's option to proceed or not proceed with the purchase of the Property. If Buyer has concerns with the Property, Buyer may during the Due Diligence Period seek to negotiate an amendment to this Agreement to address such concerns.
        (3) **Notice of Decision Not To Proceed:** Buyer shall have elected to exercise Buyer's option to purchase the Property unless prior to the end of any Due Diligence Period, Buyer notifies Seller of Buyer's decision not to proceed by delivering to Seller a notice of termination of this Agreement. In the event Buyer does not terminate this Agreement prior to the end of the Due Diligence Period, then: (a) Buyer shall have accepted the Property "as-is" subject to the terms of this Agreement; and (b) Buyer shall no longer have any right to terminate this Agreement based upon the Due Diligence Period.
    e. **Repairs:** All agreed upon repairs and replacements shall be performed in a good and workmanlike manner prior to closing.

9. Lead-Based Paint. If any portion of a residential dwelling on the Property was built prior to 1978, the Lead-Based Paint Exhibit (F316) is hereby attached as an exhibit to this Agreement. The term "residential dwelling" includes any painted fixture or material used therein that was built or manufactured prior to 1978.

10. **Brokerage Relationships in this Transaction.**
    a. **Agency Disclosure:** No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;
        (1) **No Agency Relationship:** Buyer and Seller acknowledge that, if they are not represented by Brokers in a client relationship, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
        (2) **Consent to Dual Agency:** If Broker is acting as dual agent in this transaction, Buyer and Seller consent to the same and acknowledge having been advised of the following:
            i. **Dual Agency Disclosure:** *[Applicable only if Broker is acting as a dual agent in this transaction.]*
                (a) As a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;
                (b) Broker will disclose all adverse material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;
                (c) Buyer and Seller do not have to consent to dual agency and the consent of Buyer and Seller to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.
                (d) Notwithstanding any provision to the contrary contained herein Buyer and Seller each hereby direct Broker while acting as a dual agent to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.
            ii. **Designated Agency Disclosure:** If Broker in this transaction is acting as a designated agent, Buyer and Seller consent to the same and acknowledge that each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.
    b. **Brokerage:** Seller has agreed to pay Listing Broker(s) a commission pursuant to a separate brokerage engagement agreement entered into between the parties and incorporated herein by reference ("Listing Agreement"). The Listing Broker has agreed to share that commission with the Selling Broker. The closing attorney is hereby authorized and directed to pay the Broker(s) at closing, their respective portions of the commissions out of the proceeds of the sale. If the sale proceeds are insufficient to pay the full commission, the party owing the commission shall pay any shortfall at closing. The acceptance by the Broker(s) of a partial real estate commission at the closing shall not relieve the party owing the same from paying the remainder after the closing (unless the Broker(s) have expressly agreed in writing to accept the amount paid in full satisfaction of the Broker(s) claim to a commission). The Brokers herein are signing this Agreement to reflect their role in this transaction and consent to act as Holder if either of them is named as such. This Agreement and any amendment thereto shall be enforceable even without the signature of any Broker referenced herein.
    c. **Disclaimer:** Buyer and Seller have not relied upon any advice or representations of Brokers other than what is included in this Agreement. Brokers shall have no duty to inspect the Property or to advise Buyer or Seller on any matter relating to the Property which could have been revealed through a survey, appraisal, title search, Official Georgia Wood Infestation Report, utility bill review, septic system inspection, well water test, tests for radon, asbestos, mold, methamphetamine, and lead-based paint; moisture test of stucco or synthetic stucco, inspection of the Property by a professional, construction expert, structural engineer or environmental engineer; review of this Agreement and transaction by an attorney, financial planner, mortgage consultant or tax consultant; and consulting appropriate governmental officials to determine, among other things and without limitation, the zoning of Property, whether any condemnation action is pending or has been filed or other nearby governmental improvements are planned. Buyer and Seller acknowledge that Broker does not perform or have expertise in any of the above tests, inspections, and reviews or in any of the matters handled by the professionals referenced above. Buyer and Seller should seek independent expert advice regarding any matter of concern to them relative to the Property and this Agreement. Buyer and Seller acknowledge that Broker shall not be responsible to monitor, supervise, or inspect any construction or repairs to Property and such tasks clearly fall outside the scope of real estate brokerage services. If Broker has written any special stipulations herein, the party for whom such special stipulations were written: a) confirms that each such stipulation reflects the party's complete understanding as to the substance and form of the special stipulations; b) hereby adopts each special stipulation as the original work of the party; and c) hereby agrees to indemnify and hold Broker who prepared the stipulation harmless from any and all claims, causes of action, suits, and damages arising out of or relating to such special stipulation. Buyer acknowledges that when and if Broker answers a question of Buyer or otherwise describes some aspect of the Property or the transaction, Broker is doing so based upon information provided by Seller rather than the independent knowledge of Broker (unless Broker makes an independent written disclosure to the contrary).

11. **Time Limit of Offer.** The Time Limit of the Offer shall be the date and time referenced herein when the Offer expires unless prior to that date and time both of the following have occurred: (a) the Offer has been accepted by the party to whom the Offer was made; and (b) notice of acceptance of the Offer has been delivered to the party who made the Offer.

C. **OTHER TERMS AND CONDITIONS**

1. **Notices.**
    a. **Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.
    b. **Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party; (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein). Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

c. **When Broker Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker and any affiliated licensee of the Broker representing a party in a client relationship shall be authorized agents of the party and notice to any of them shall for all purposes herein be deemed to be notice to the party. Notice to an authorized agent shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the notice provisions herein). Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker or the Broker's affiliated licensees are authorized to receive notices delivered by a Delivery Service. The Broker, the Broker's staff and the affiliated licensees of the Broker shall not be authorized to receive notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent of a client shall be an authorized agent of the client for the purposes of receiving notice.

2. <u>Default</u>.
   a. **Remedies of Seller:** In the event this Agreement fails to close due to the default of Buyer, Seller's sole remedy shall be to retain the earnest money as full liquidated damages. Seller expressly waives any right to assert a claim for specific performance. The parties expressly agree that the earnest money is a reasonable pre-estimate of Seller's actual damages, which damages the parties agree are difficult to ascertain. The parties expressly intend for the earnest money to serve as liquidated damages and not as a penalty.
   b. **Remedies of Buyer:** In the event this Agreement fails to close due to the default of Seller, Buyer may either seek the specific performance of this Agreement or terminate this Agreement upon notice to Seller and Holder, in which case all earnest money deposits and other payments Buyer has paid towards the purchase of the Property shall be returned to Buyer following the procedures set forth elsewhere herein.
   c. **Rights of Broker:** In the event this Agreement is terminated or fails to close due to the default of a party hereto, the defaulting party shall pay as liquidated damages to every broker involved in this transaction with whom the defaulting party does not have a brokerage engagement agreement an amount equal to the share of the commission the broker would have received had the transaction closed. For purposes of determining the amount of liquidated damages to be paid by the defaulting party, the written offer(s) of compensation to such broker and/or other written agreements establishing such broker's commission are incorporated herein by reference. The liquidated damages referenced above are a reasonable pre-estimate of the Broker(s) actual damages and are not a penalty. In the event a Broker referenced herein either has a brokerage engagement agreement or other written agreement for the payment of a real estate commission with a defaulting party, the Broker shall only have such remedies against the defaulting party as are provided for in such agreement.
   d. **Attorney's Fees:** In any litigation or arbitration arising out of this Agreement, including but not limited to breach of contract claims between Buyer and Seller and commission claims brought by a broker, the non-prevailing party shall be liable to the prevailing party for its reasonable attorney's fees and expenses.

3. <u>Risk of Damage to Property</u>. Seller warrants that at the time of closing the Property and all items remaining with the Property, if any, will be in substantially the same condition (including conditions disclosed in the Seller's Property Disclosure Statement) as on the Binding Agreement Date, except for changes made to the condition of Property pursuant to the written agreement of Buyer and Seller. At time of possession, Seller shall deliver Property clean and free of trash, debris, and personal property of Seller not identified as remaining with the Property. Notwithstanding the above, if the Property is destroyed or substantially damaged prior to closing, Seller shall promptly give notice to Buyer of the same and provide Buyer with whatever information Seller has regarding the availability of insurance and the disposition of any insurance claim. Buyer or Seller may terminate this Agreement without penalty not later than fourteen (14) days from receipt of the above notice. If Buyer or Seller do not terminate this Agreement, Seller shall cause Property to be restored to substantially the same condition as on the Binding Agreement Date. The date of closing shall be extended until the earlier of one year from the original date of closing, or seven (7) days from the date that Property has been restored to substantially the same condition as on the Binding Agreement Date and a new certificate of occupancy (if required) is issued.

4. <u>Other Provisions</u>.
   a. **Condemnation:** Seller shall: (1) immediately notify Buyer if the Property becomes subject to a condemnation proceeding; and (2) provide Buyer with the details of the same. Upon receipt of such notice, Buyer shall have the right, but not the obligation for 7 days thereafter, to terminate this Agreement upon notice to Seller in which event Buyer shall be entitled to a refund of all earnest money and other monies paid by Buyer toward the Property without deduction or penalty. If Buyer does not terminate the Agreement within this time frame, Buyer agrees to accept the Property less any portion taken by the condemnation and if Buyer closes, Buyer shall be entitled to receive any condemnation award or negotiated payment for all or a portion of the Property transferred or conveyed in lieu of condemnation.
   b. **Consent to Share Non-Public Information:** Buyer and Seller hereby consent to the closing attorney preparing and distributing an American Land Title Association ("ALTA") Estimated Settlement Statement-Combined or other combined settlement statement to Buyer, Seller, Brokers and Brokers' affiliated licensees working on the transaction reflected in this Agreement for their various uses.
   c. **Duty to Cooperate:** All parties agree to do all things reasonably necessary to timely and in good faith fulfill the terms of this Agreement. Buyer and Seller shall execute and deliver such certifications, affidavits, and statements required by law or reasonably requested by the closing attorney, mortgage lender and/or the title insurance company to meet their respective requirements.
   d. **Electronic Signatures:** For all purposes herein, an electronic or facsimile signature shall be deemed the same as an original signature; provided, however, that all parties agree to promptly re-execute a conformed copy of this Agreement with original signatures if requested to do so by, the buyer's mortgage lender or the other party.
   e. **Entire Agreement, Modification and Assignment:** This Agreement constitutes the sole and entire agreement between all of the parties, supersedes all of their prior written and verbal agreements and shall be binding upon the parties and their successors, heirs and permitted assigns. No representation, promise or inducement not included in this Agreement shall be binding upon any party hereto. This Agreement may not be amended or waived except upon the written agreement of Buyer and Seller. Any agreement to terminate this Agreement or any other subsequent agreement of the Parties relating to the Property must be in writing and signed by the Parties. This Agreement may not be assigned by Buyer except with the written approval of Seller which may be withheld for any reason or no reason. Any assignee shall fulfill all the terms and conditions of this Agreement.

dotloop signature verification:

    f. **Extension of Deadlines:** No time deadline under this Agreement shall be extended by virtue of it falling on a Saturday, Sunday or federal holiday except for the date of closing.

    g. **GAR Forms:** The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

    h. **Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

    i. **No Authority to Bind:** No Broker or affiliated licensee of Broker, by virtue of this status, shall have any authority to bind any party hereto to any contract, provisions herein, amendments hereto, or termination hereof. However, if authorized in this Agreement, Broker shall have the right to accept notice on behalf of a party. Additionally, any Broker or real estate licensee involved in this transaction may perform the ministerial act of filling in the Binding Agreement Date. In the event of a dispute over the Binding Agreement Date, it may only be resolved by the written agreement of the Buyer and Seller.

    j. **Notice of Binding Agreement Date:** The Binding Agreement Date shall be the date when a party to this transaction who has accepted an offer or counteroffer to buy or sell real property delivers notice of that acceptance to the party who made the offer or counteroffer in accordance with the Notices section of the Agreement. Notice of the Binding Agreement Date may be delivered by either party (or the Broker working with or representing such party) to the other party. If notice of accurate Binding Agreement Date is delivered, the party receiving notice shall sign the same and immediately return it to the other party.

    k. **Survival of Agreement:** The following shall survive the closing of this Agreement: (1) the obligation of a party to pay a real estate commission; (2) any warranty of title; (3) all representations of Seller regarding the Property; (4) the section on condemnation; and (5) any obligations which the parties herein agree shall survive the closing or may be performed or fulfilled after the closing.

    l. **Terminology:** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; and (2) all pronouns shall mean and include the person, entity, firm, or corporation to which they relate. The letters "N.A." or "N/A", if used in this Agreement, shall mean "Not Applicable", except where the context would indicate otherwise.

    m. **Time of Essence:** Time is of the essence of this Agreement.

5. **Definitions.**

    a. **Banking Day:** A "Banking Day" shall mean a day on which a bank is open to the public for carrying out substantially all of its banking functions. For purposes herein, a "Banking Day" shall mean Monday through Friday excluding federal holidays.

    b. **Binding Agreement Date:** The "Binding Agreement Date" shall be the date when a party to this transaction who has accepted an offer or counteroffer to buy or sell real property delivers notice of that acceptance to the party who made the offer or counteroffer in accordance with the Notices section of the Agreement. Once that occurs, this Agreement shall be deemed a Binding Agreement.

    c. **Broker:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and its affiliated licensees unless the context would indicate otherwise.

    d. **Business Day:** A "Business Day" shall mean a day on which substantially all businesses are open for business. For all purposes herein, a "Business Day" shall mean Monday through Friday excluding federal holidays.

    e. **Material Relationship:** A material relationship shall mean any actually known personal, familial, social, or business relationship between the broker or the broker's affiliated licensees and any other party to this transaction which could impair the ability of the broker or affiliated licensees to exercise fair and independent judgment relative to their client.

6. **WARNING TO BUYERS AND SELLERS**: BEWARE OF CYBER-FRAUD. Fraudulent e-mails attempting to get the buyer and/or seller to wire money to criminal computer hackers are increasingly common in real estate transactions. Specifically, criminals are impersonating the online identity of the actual mortgage lender, closing attorney, real estate broker or other person or companies involved in the real estate transaction. In that role, the criminals send fake wiring instructions attempting to trick buyers and/or sellers into wiring them money related to the real estate transaction, including, for example, the buyer's earnest money, the cash needed for the buyer to close, and/or the seller's proceeds from the closing. These instructions, if followed, will result in the money being wired to the criminals. In many cases, the fraudulent email is believable because it is sent from what appears to be the email address/domain of the legitimate company or person responsible for sending the buyer or seller wiring instructions. The buyer and/or seller should verify wiring instructions sent by email by independently looking up and calling the telephone number of the company or person purporting to have sent them. Buyers and sellers should never call the telephone number providing with wiring instructions sent by email since they may end up receiving a fake verification from the criminals. Buyer and sellers should be on special alert for: 1) emails directing the buyer and/or seller to wire money to a bank or bank account in a state other than Georgia; and 2) emails from a person or company involved in the real estate transaction that are slightly different (often by one letter, number, or character) from the actual email address of the person or company.

**LIMITATION OF LIABILITY**. Buyer and seller in this Agreement hereby agree to limit the damages and amount of money for which the Broker and/or the Broker's officers, directors, employees and licensees can be held liable for in a transaction in which the Buyer and/or Seller has been victimized by wire or cyber-fraud to $100 in total.

Buyer(s) Initials [BK]    Seller(s) Initials [MF]

7. **Exhibits and Addenda**. All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement. If any such exhibit or addendum conflicts with any preceding paragraph (including any changes thereto made by the parties), said exhibit or addendum shall control:

- ☐ All Cash Sale Exhibit (F401) *____
- ☐ Back-up Agreement Contingency Exhibit (F604) *____
- ☐ Closing Attorney Acting as Holder of Earnest Money Exhibit (F510) *____
- ☐ Community Association Fees, Disclosures and Related Issues ("Disclosure") Exhibit (F322) *____
- ☐ Condominium Resale Purchase and Sale Exhibit (F204) *____
- ☒ Conventional Loan Contingency Exhibit (F404) *C____
- ☐ FHA Loan Contingency Exhibit (F407) *____
- ☒ Lead-Based Paint Exhibit (F316) *A____
- ☐ Lease Purchase and Sale Exhibit (F207) (to be used with F916) *____
- ☐ Lease for Lease/Purchase Agreement (F916) (to be used with F207) *____
- ☐ Legal Description Exhibit (F807 or other) *____
- ☐ Loan Assumption Exhibit (F416) *____
- ☐ Sale or Lease of Buyer's Property Contingency Exhibit (F601) *____
- ☒ Seller's Property Disclosure Statement Exhibit (F301, F304, F307 or F310) *B____
- ☐ Survey of Property as Exhibit *____
- ☐ Temporary Occupancy Agreement for Seller after Closing Exhibit (F219) *____
- ☐ USDA-RD Loan Contingency Exhibit (F413) *____
- ☐ VA Loan Contingency Exhibit (F410) *____
- ☐ Other ____
- ☐ Other ____

**SPECIAL STIPULATIONS**: The following Special Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph (including any changes thereto made by the parties), shall control:

Seller agrees to deliver the property at closing free and clear of all tenants and all personal items.

Seller agrees to provide documentation for current R5 zoning to buyer prior to closing.

☐ Additional Special Stipulations are attached.

Dotloop signature verification

## Buyer Acceptance and Contact Information

*[signature]*
1 Buyer's Signature

Elizabeth Ann Kapp     06/20/2019
Print or Type Name     Date

Buyer's Address for Receiving Notice

_____

Buyer's Phone Number: ☐ Cell  ☐ Home  ☐ Work

atacourtllc@gmail.com
Buyer's E-mail Address

2 Buyer's Signature

Print or Type Name     Date

Buyer's Address for Receiving Notice

Buyer's Phone Number: ☐ Cell  ☐ Home  ☐ Work

Buyer's E-mail Address

☐ Additional Signature Page (F267) is attached.

## Seller Acceptance and Contact Information

*[signature: Millard Farmer]*
1 Seller's Signature

Millard Farmer     June 21, 2019
Print or Type Name     Date

Seller's Address for Receiving Notice

_____

Seller's Phone Number: ☐ Cell  ☐ Home  ☐ Work

Seller's E-mail Address

2 Seller's Signature

Print or Type Name     Date

Seller's Address for Receiving Notice

Seller's Phone Number: ☐ Cell  ☐ Home  ☐ Work

Seller's E-mail Address

☐ Additional Signature Page (F267) is attached.

## Selling Broker/Affiliated Licensee Contact Information

Keller Williams Realty Cityside
Selling Brokerage Firm

*[signature: Melanie Smith]*
Broker/Affiliated Licensee Signature     Date

Melanie Smith     343365
Print or Type Name     GA Real Estate License #

770-815-2864     770-874-6300
Licensee's Phone Number     Fax Number

melaniesmith@kw.com
Licensee's E-mail Address

Atlanta Board
REALTOR® Membership

3350 Atlanta Road
Broker's Address

Smyrna, GA 30080

770-874-6200     770-874-6300
Broker's Phone Number     Fax Number

KWSV01     H-46186
MLS Office Code     Brokerage Firm License Number

## Listing Broker/Affiliated Licensee Contact Information

RE/MAX Around Atlanta Realty
Listing Broker Firm

*[signature: Donna Hall]*
Broker/Affiliated Licensee Signature     Date

Donna J Hall     212481
Print or Type Name     GA Real Estate License #

404-863-7777     404-442-7333
Licensee's Phone Number     Fax Number

halldj@me.com
Licensee's Email Address

Atlanta Board
REALTOR® Membership

17 Lenox Pointe NE, Suite B
Broker's Address

Atlanta, GA 30324

404-592-5750     404-974-4930
Broker's Phone Number     Fax Number

RMAA11     H-53737
MLS Office Code     Brokerage Firm License Number

**Binding Agreement Date:** The Binding Agreement Date in this transaction is the date of June 21, 2019 and has been filled in by Donna Hall

Copyright© 2019 by Georgia Association of REALTORS®, Inc.     F201, Purchase and Sale Agreement, Page 8 of 8, 06/01/19

dotloop signature verification:

## CONVENTIONAL LOAN CONTINGENCY
### EXHIBIT "C___"

**Georgia REALTORS®**

**2019 Printing**

This Exhibit is part of the Agreement with an Offer Date of 06/20/2019 _____ for the purchase and sale of that certain Property known as: 1196 Dekalb Avenue NE _____, Atlanta _____, Georgia 30307 _____.

1. **Application.** Buyer shall promptly apply for and in good faith seek to obtain the conventional loan or loans described below ("Loan(s)") such that Buyer can fulfill Buyer's obligations hereunder prior to the expiration of this Conventional Loan Contingency.

   *[Select A. or A. and B. below. Any box not selected shall not be a part of this Agreement. All Loan terms must be filled in.]*

| | | Loan Amount | Term | Interest Rate (at par) | Rate Type | Source Of Loans Term |
|---|---|---|---|---|---|---|
| ☑ A. | FIRST MORTGAGE LOAN | 80 % of purchase price | 30 years | 3.85 % per annum (or initial rate on adjustable loan) | ☑ Fixed<br>☐ Adjustable<br>☐ Interest Only | ☑ Institutional<br>☐ Seller<br>☐ Other |
| ☐ B. | SECOND MORTGAGE LOAN | ___ % of purchase price | ___ years | ___ % per annum (or initial rate on adjustable loan) | ☐ Fixed<br>☐ Adjustable<br>☐ Interest Only | ☐ Institutional<br>☐ Seller<br>☐ Other |

2. **Use of Particular Mortgage Lender.** Unless an Approved Mortgage Lender is identified below, Buyer may apply for approval of the Loan(s) with any institutional mortgage lender licensed to do business in Georgia. If an Approved Mortgage Lender(s) is identified below, Buyer shall apply for approval of the Loan(s) with at least one such Approved Mortgage Lender. Nothing herein shall require Buyer to obtain mortgage financing from an Approved Mortgage Lender.

   **Approved Mortgage Lender(s)**

   Matt Garcia - Supreme Lending - matt.garcia@supremelending.com

   (hereinafter singularly "Approved Mortgage Lender" and collectively "Approved Mortgage Lender(s)")

3. **Buyer May Apply for Different Loan(s).** A Loan Denial Letter (as that term is defined below) must be for the Loan(s) described above. Buyer may also apply for different loans than the Loan(s) described above. However, the denial of such other loans shall not be a basis for Buyer to terminate this Agreement.

4. **Buyer to Notify Seller of Intent to Proceed.** When it is known, Buyer shall promptly notify seller of any mortgage lender to whom Buyer has sent a notice of intent to proceed with loan application and the name and contact information for the loan originator.

5. **Financing Contingency.** Buyer shall have 21 days from the Binding Agreement Date ("Financing Contingency Period") to determine if Buyer has the ability to obtain the Loan(s) described above ("Financing Contingency"). Buyer shall be deemed to have the ability to obtain the Loan(s) unless prior to the end of the Financing Contingency Period, Buyer: a) notifies Seller that Buyer is terminating the Agreement because Buyer has been turned down for the Loan(s) and b) provides Seller within seven (7) days from the date of such notice a letter of loan denial from a mortgage lender based upon the mortgage lender's customary and standard underwriting criteria ("Loan Denial Letter"). The Loan Denial Letter and mortgage lender issuing the Loan Denial Letter must meet all of the requirements set forth elsewhere in this Exhibit. Notwithstanding any provision to the contrary contained herein, the Loan Denial Letter may be provided to Seller after the Financing Contingency Period has ended if the above-referenced seven (7) day period to provide the Loan Denial Letter falls outside of the Financing Contingency Period.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Melanie Smith IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2019 by Georgia Association of REALTORS®, Inc.                F404, Conventional Loan Contingency Exhibit, Page 1 of 3, 01/01/19

dotloop signature verification:

6. **Use of Approved Mortgage Lender and Loan Denial Letter.** If Buyer has agreed to apply for the Loan(s) with an Approved Mortgage Lender, the Loan Denial Letter must be from an Approved Mortgage Lender. If Buyer is not required to apply for the Loan(s) with an Approved Mortgage Lender, the Loan Denial Letter may be from any institutional mortgage lender licensed to do business in Georgia. A Loan Denial Letter from a non-institutional mortgage lender shall not be the basis for Buyer to terminate this Agreement.

   Notwithstanding any provision to the contrary contained herein, the Loan Denial Letter may not be based solely upon any of the following: (a) Buyer lacking sufficient funds other than the amount of the Loan(s) to close; (b) Buyer not having leased or sold other real property (unless such a contingency is expressly provided for in this Agreement); (c) Buyer not having provided the lender(s) in a timely fashion with all information required by lender, including but not limited to, loan documentation, Official Wood Infestation Reports, structural letters, well tests, septic system certifications, flood plain certifications and any other similar information required by lender (hereinafter collectively "Required Information"); or (d) Buyer making purchases that adversely affect Buyer's debt to income ratio.

   Buyer may terminate this Agreement without penalty based upon an inability to obtain the Loan(s) only if Buyer fulfills all of the applicable requirements set forth in this Exhibit.

7. **Right of Seller to Request Evidence of Buyer's Ability to Close.** If the Financing Contingency ends without Buyer terminating this Agreement, Seller shall have the right, but not the obligation, to request that Buyer provide Seller with written evidence of Buyer's financial ability to purchase the Property ("Evidence"). A copy of a loan commitment from each institutional mortgage lender from whom Buyer is seeking mortgage financing to purchase the Property stating the type, amount and terms of the loan(s) and the conditions for funding the loan(s), shall be deemed sufficient Evidence. The provision of such Evidence is not a guarantee that the mortgage loan(s) will be funded or that Buyer will close on the purchase of the Property. Buyer shall have seven (7) days from the date Seller delivers notice to Buyer requesting such Evidence to produce the same. No request for such Evidence shall be made by Seller less than seven (7) days from the date of Closing.

8. **Seller's Right to Terminate.** In the event Buyer fails to provide Seller with the Evidence of Buyer's Ability to Close within the timeframe set forth above, Seller shall notify Buyer of the default and give Buyer three (3) days from the date of the delivery of the notice to cure the same. If Buyer does not timely cure the default, Seller may terminate this Agreement within seven (7) days thereafter due to Buyer's default upon notice to Buyer. In the event Seller does not terminate this Agreement within that timeframe, the right to terminate on this basis shall be waived.

9. **Authorization of Buyer to Release Information to Seller and Brokers.** Buyer does hereby authorize Seller and the Brokers identified herein to communicate with the lenders with whom Buyer is working to determine and receive from said lenders any or all of the following information: (a) the status of the loan application; (b) Buyer's financial ability to obtain the Loan(s) or other loans for which Buyer has applied; (c) whether and when Buyer provided the lenders with Required Information; (d) whether and what conditions may remain to complete the loan application process and issue of a loan commitment; and (e) the basis for any Loan Denial Letter.

10. **Miscellaneous.** For the purposes of this Exhibit, the term "mortgage loan" shall refer to a secured lending transaction where the loan or promissory note is secured by a deed to secure debt on the Property. Whether such mortgage loan is a first or second mortgage loan is a reference to the legal priorities of the deeds to secure debt relative to each other and other liens and encumbrances.

11. **Appraisal Contingency.** In addition to Buyer's other rights herein, this Agreement shall be subject to the following appraisal contingency. Buyer shall cause the Lender to: (a) select an appraiser to perform one or more appraisals of the Property and (b) provide Buyer with a copy of any appraisal that is for less than the purchase price of the Property. If any such appraisal is for less than the purchase price, Buyer shall within 21 days of the Binding Agreement Date have the right to request that Seller reduce the sales price of the Property to a price not less than the appraised price by submitting an Amendment to Sales Price (F713) ("ATSP") to Seller along with a copy of the appraisal supporting the lower price. In the event that Buyer does not submit an ATSP to Seller, Buyer shall be deemed to have waived Buyer's right to do so and this Agreement shall no longer be subject to an appraisal contingency.

    Seller shall accept or reject the ATSP within three (3) days from the date that the ATSP is delivered to Seller but not later than one (1) day prior to the Closing (excluding any extensions of the closing resulting from the unilateral extension of the closing date). If Seller timely accepts the ATSP, Buyer shall be obligated to purchase the Property in accordance with this Agreement as amended by the ATSP. If Seller does not accept the ATSP, Buyer shall have the right, but not the obligation, to terminate this Agreement without penalty upon notice to Seller given within three (3) days of the date that Buyer receives notice that Seller has not accepted the ATSP but not later than one (1) day prior to the Closing. Nothing herein shall require Buyer to seek a reduction in the sales price of the Property. In such event, Buyer shall be obligated to purchase the Property for the price set forth in this Agreement.

12. **Lender Required Repairs.** Any repairs required by lender are to be completed and paid for by NA prior to Closing provided such repairs do not exceed $NA in total costs. In the event the anticipated costs exceed the amount listed above, an itemized estimate shall be provided to all parties from third-party contractor(s), selected by Seller, of the total costs of repairs to be made to the Property.

    Seller or Buyer shall have the option to pay the excess amount. If the parties do not agree in writing who shall pay the excess amount, then this Agreement shall terminate within three (3) days of written notice of itemized estimate.

docusign signature verification

_Elizabeth Ann Kapp_
**1 Buyer's Signature**

Elizabeth Ann Kapp
Print or Type Name

**2 Buyer's Signature**

Print or Type Name

☐ Additional Signature Page (F267) is attached.

Keller Williams Realty Cityside
Selling Brokerage Firm

_Melanie Smith_
**Broker/Affiliated Licensee Signature**

Melanie Smith
Print or Type Name

Atlanta Board of Realtors
REALTOR® Membership

_Millard Farmer  June 2, 2019_
**1 Seller's Signature**

Millard Farmer
Print or Type Name

**2 Seller's Signature**

Print or Type Name

☐ Additional Signature Page (F267) is attached.

RE/MAX Around Atlanta Realty
Listing Brokerage Firm

_Donna J. Hall_
**Broker/Affiliated Licensee Signature**

Donna J. Hall
Print or Type Name

Atlanta Board
REALTOR® Membership

Copyright© 2018 by Georgia Association of REALTORS®, Inc.    F404, Conventional Loan Contingency Exhibit, Page 3 of 3, 01/01/18




# SELLER'S PROPERTY DISCLOSURE STATEMENT
## EXHIBIT "B____"

2019 Printing

This Seller's Property Disclosure Statement ("Statement") is an exhibit to the Purchase and Sale Agreement with an Offer Date of 06/20/2019 for the Property (known as or located at: 1196 Dekalb Avenue NE Atlanta, Georgia, 30307). This Statement is intended to make it easier for Seller to fulfill Seller's legal duty to disclose hidden defects in the Property of which Seller is aware. Seller is obligated to disclose such defects even when the Property is being sold "as-is."

A. INSTRUCTIONS TO SELLER IN COMPLETING THIS STATEMENT.
   In completing this Statement, Seller agrees to:
   (1) answer all questions in reference to the Property and the improvements thereon;
   (2) answer all questions fully, accurately and to the actual knowledge and belief of all Sellers;
   (3) provide additional explanations to all "yes" answers in the corresponding Explanation section below each group of questions, unless the "yes" answer is self-evident;
   (4) promptly revise the Statement if there are any material changes in the answers to any of the questions prior to closing and provide a copy of the same to the Buyer and any Broker involved in the transaction.

B. HOW THIS STATEMENT SHOULD BE USED BY BUYER. Caveat emptor or "buyer beware" is the law in Georgia. Buyer should conduct a thorough inspection of the Property. If Seller has not occupied the Property recently, Seller's knowledge of the Property's condition may be limited. Buyer is expected to use reasonable care to inspect the Property and confirm that is suitable for Buyer's purposes. If an inspection of the Property reveals problems or areas of concern that would cause a reasonable Buyer to investigate further, Buyer should investigate further. A "yes" or "no" answer to a question means "yes" or "no" to the actual knowledge and belief of all Sellers of the Property.

C. SELLER DISCLOSURES.

| 1. | GENERAL: | YES | NO |
|---|---|---|---|
| | (a) What year was the main residential dwelling constructed? 1990 | | |
| | (b) Is the Property vacant? | | ✓ |
| | If yes, how long has it been since the Property has been occupied? ____ | | |
| | (c) Is the Property or any portion thereof leased? | ✓ | |
| | (d) Has the Property been designated as historic or in a historic district where permission must be received to make modifications and additions? not to the best of my knowledge | | ✓ |
| EXPLANATION: | | | |

| 2. | COVENANTS, FEES, and ASSESSMENTS: | YES | NO |
|---|---|---|---|
| | (a) Is the Property subject to a recorded Declaration of Covenants, Conditions, and Restrictions ("CC&Rs") or other similar restrictions? | | ✓ |
| | (b) Is the Property part of a condominium or community in which there is a community association? IF YES, SELLER TO COMPLETE AND PROVIDE BUYER WITH A "COMMUNITY ASSOCIATION FEES, DISCLOSURES AND RELATED ISSUES" GAR F322. | | ✓ |
| EXPLANATION: | | | |

| 3. | LEAD-BASED PAINT: | YES | NO |
|---|---|---|---|
| | (a) Was any part of the residential dwelling on the Property or any painted component, fixture, or material used therein constructed or manufacture prior to 1978? IF YES, THE "LEAD-BASED PAINT EXHIBIT" GAR F316 MUST BE EXECUTED BY THE PARTIES AND THE "LEAD-BASED PAINT PAMPHLET" GAR CB04 MUST BE PROVIDED TO THE BUYER. | ✓ | |

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Donna J Hall IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2019 by Georgia Association of REALTORS®, Inc.    F301, Seller's Property Disclosure Statement Exhibit, Page 1 of 7, 01/01/19

| 4. STRUCTURAL ITEMS, ADDITIONS AND ALTERATIONS: | YES | NO |
|---|---|---|
| (a) Has there been any settling, movement, cracking or breakage of the foundations or structural supports of the improvements? | ✓ | |
| (b) Have any structural reinforcements or supports been added? *unknown* | ✓ | |
| (c) Have there been any additions, structural changes, or any other major alterations to the original improvements or Property, including without limitation pools, carports or storage buildings? | ✓ | |
| (d) Has any work been done where a required building permit was not obtained? | | ✓ |
| (e) Are there violations of building codes, housing codes, or zoning regulations (not otherwise grandfathered)? | | ✓ |
| (f) Have any notices alleging such violations been received? | | ✓ |
| (g) Is any portion of the main dwelling a mobile, modular or manufactured home? | | ✓ |
| (h) Was any dwelling or portion thereof (excluding mobile, modular and manufactured dwelling) moved to the site from another location? | | ✓ |

EXPLANATION:

| 5. SYSTEMS and COMPONENTS: | YES | NO |
|---|---|---|
| (a) Approximate age of HVAC system(s): _____ years  *unknown* | | |
| (b) Is any heated and cooled portion of the main dwelling not served by a central heating and cooling system?  *some closets* | ✓ | |
| (c) Is any portion of the heating and cooling system in need of repair or replacement? | ✓ | |
| (d) Does any dwelling or garage have aluminum wiring other than in the primary service line? | | ✓ |
| (e) Are any fireplaces decorative only or in need of repair? | | ✓ |
| (f) Have there been any reports of damaging moisture behind exterior walls constructed of synthetic stucco?  *unknown* | | |

EXPLANATION:

| 6. SEWER/PLUMBING RELATED ITEMS: | YES | NO |
|---|---|---|
| (a) What is the drinking water source: ☑ public ☐ private ☐ well | | |
| (b) If the drinking water is from a well, has there ever been a test the results of which indicate that the water is not safe to drink? | | |
| (c) What is the sewer system: ☑ public ☐ private ☐ septic tank | | |
| (d) If the Property is served by a septic system, how many bedrooms was the septic system approved for by local government authorities? _____ | | |
| (e) Is the main dwelling served by a sewage pump? | | ✓ |
| (f) Has any septic tank or cesspool on Property ever been professionally serviced?  *N/A* | | |
| If yes, please give the date of last service: _____ | | |
| (g) Are there any leaks, backups, or other similar problems with any portion of the plumbing, water, or sewage systems or damage therefrom? | | ✓ |
| (h) Is there presently any polybutylene plumbing, other than the primary service line? | | ✓ |
| (i) Has there ever been any damage from a frozen water line, spigot, or fixture?  *unknown* | | |

EXPLANATION:

| 7. ROOFS, GUTTERS, and DOWNSPOUTS: | YES | NO |
|---|---|---|
| (a) Approximate age of roof on main dwelling: _____ years.  unknown | | |
| (b) Has any part of the roof been repaired during Seller's ownership? | ✓ | |
| (c) Are there any roof leaks or other problems with the roof, roof flashing, gutters, or downspouts? | ✓ | |

EXPLANATION: leak in 2nd floor – art studio and in bedroom with Murphy bed

| 8. FLOODING, DRAINING, MOISTURE, and SPRINGS: | YES | NO |
|---|---|---|
| (a) Is there now or has there been any water intrusion in the basement, crawl space or other parts of any dwelling or garage or damage therefrom? | | ✓ |
| (b) Have any repairs been made to control water intrusion in the basement, crawl space, or other parts of any dwelling or garage? | | ✓ |
| (c) Is any part of the Property or any improvements thereon presently located in a Special Flood Hazard Area? | | ✓ |
| (d) Has there ever been any flooding? | | ✓ |
| (e) Are there any streams that do not flow year round or underground springs? | | ✓ |
| (f) Are there any dams, retention ponds, storm water detention basins, or other similar facilities? | | ✓ |

EXPLANATION:

| 9. SOIL AND BOUNDARIES: | YES | NO |
|---|---|---|
| (a) Are there any landfills (other than foundation backfill), graves, burial pits, caves, mine shafts, trash dumps or wells (in use or abandoned)? | | ✓ |
| (b) Is there now or has there ever been any visible soil settlement or movement? | ✓ | |
| (c) Are there presently any encroachments, unrecorded easements or boundary line disputes with a neighboring property owner? | | ✓ |
| (d) Do any of the improvements encroach onto a neighboring property? | | ✓ |

EXPLANATION:

| 10. TERMITES, DRY ROT, PESTS, and WOOD DESTROYING ORGANISMS: | YES | NO |
|---|---|---|
| (a) Is there any damage resulting from animals (such as squirrels, mice, possum or raccoons); insects (such as termites, bees and ants); or by fungi or dry rot? | ✓ | |
| (b) Is there presently a bond, warranty or service contract for termites or other wood destroying organisms by a licensed pest control company? | | ✓ |
| If yes, is it transferable?    What is the cost? $_____ | | |
| If yes, company name/contact: _____ | | |
| Coverage: ☐ re-treatment and repair    ☐ re-treatment    ☐ periodic inspections only | | |
| Expiration Date _____    Renewal Date _____ | | |
| (c) Is there a cost to maintain the bond, warranty or service contract? | | |
| If yes, what is the annual cost? $_____ | | |

EXPLANATION:

dotloop signature verification:

| 11. | ENVIRONMENTAL, HEALTH, and SAFETY CONCERNS: | YES | NO |
|---|---|---|---|
| | (a) Are there any underground tanks or toxic or hazardous substances such as asbestos? _unknown_ | | |
| | (b) Has Methamphetamine ("Meth") ever been produced on the Property? | | ✓ |
| | (c) Have there ever been adverse test results for radon, lead, mold or any other potentially toxic or environmentally hazardous substances? _unknown_ | | |

EXPLANATION:

| 12. | LITIGATION and INSURANCE: | YES | NO |
|---|---|---|---|
| | (a) Is there now or has there been any litigation therein alleging negligent construction or defective building products? | | ✓ |
| | (b) Has there been any award or payment of money in lieu of repairs for defective building products or poor construction? | | ✓ |
| | (c) Has any release been signed regarding defective products or poor construction that would limit a future owner from making any claims? | | ✓ |
| | (d) During Seller's ownership have there been any insurance claims for more than 10% of the value of the Property? | | ✓ |
| | (e) Is the Property subject to a threatened or pending condemnation action? | | ✓ |
| | (f) How many insurance claims have been filed during Seller's ownership? _____ | | |

EXPLANATION:

| 13. | OTHER HIDDEN DEFECTS: | YES | NO |
|---|---|---|---|
| | (a) Are there any other hidden defects that have not otherwise been disclosed? _Not to the best of my knowledge_ | | |

EXPLANATION:

| 14. | AGRICULTURAL DISCLOSURE: | YES | NO |
|---|---|---|---|
| | (a) Is Property within, partially within, or adjacent to any property zoned or identified on an approved county land use plan as agricultural or forestry use? | | ✓ |
| | It is the policy of this state and this community to conserve, protect, and encourage the development and improvement of farm and forest land for the production of food, fiber, and other products, and also for its natural and environmental value. This notice is to inform prospective property owners or other persons or entities leasing or acquiring an interest in real property that property in which they are about to acquire an interest lies within, partially within, or adjacent to an area zoned, used, or identified for farm and forest activities and that farm and forest activities occur in the area. Such farm and forest activities may include intensive operations that cause discomfort and inconveniences that involve, but are not limited to, noises, odors, fumes, dust, smoke, insects, operations of machinery during any 24-hour period, storage and disposal of manure, and the application by spraying or otherwise of chemical fertilizers, soil amendments, herbicides, and pesticides. One or more of these inconveniences may occur as the result of farm or forest activities which are in conformance with existing laws and regulations and accepted customs and standards. | | |

dotloop signature verification: dtlp.us/48gh-sy9A-bVog

| ADDITIONAL EXPLANATIONS (If needed): |
|---|
| |

dotloop signature verification: [illegible]

### D. FIXTURES CHECKLIST

**Directions on HOW TO USE:** It is often unclear what constitutes a fixture which remains with the Property versus personal property which does not remain with the Property. To avoid disputes, Seller shall have the right to remove all items on the checklist below that are left blank. THE ITEMS ON THE CHECKLIST BELOW THAT ARE CHECKED OR MARKED SHALL REMAIN WITH THE PROPERTY. All items remaining with Property shall include remotes and/or all accessories necessary for use. Unless otherwise indicated, if an item is left blank, the Seller may remove all of that item from the Property. For example, if "Refrigerator" is left blank, Seller may remove all Refrigerators on the Property. This checklist is intended to supersede the common law of fixtures with regard to the items below. The common law of fixtures shall apply to all items not on this checklist. Seller shall remove all items left blank below prior to closing or the transfer of possession, whichever is later. Seller shall lose the right to remove those items not timely removed. In removing items, Seller shall use reasonable care to prevent and repair damage to the area where the item was removed. Items identified as remaining with the Property shall mean those specific items as they existed in the Property as of the Binding Agreement Date. No such item shall be removed from the Property unless it is broken or destroyed. In such an event, it shall be replaced with a substantially identical item, if reasonably available. If not reasonably available, it shall be replaced with a substantially similar item of equal quality and value, or better. The same or newer model of the item being replaced in the same color and size and with the same functions or better shall be considered substantially identical.

**Appliances**
- ☑ Clothes Dryer
- ☑ Clothes Washing Machine
- ☑ Dishwasher
- ☐ Garage Door Opener
- ☑ Garbage Disposal
- ☑ Ice Maker *may not work*
- ☐ Microwave Oven
- ☑ Oven
- ☐ Refrigerator w/o Freezer
- ☐ Refrigerator/Freezer
- ☐ Free Standing Freezer
- ☑ Stove
- ☐ Surface Cook Top
- ☐ Trash Compactor
- ☐ Vacuum System
- ☐ Vent Hood
- ☐ Warming Drawer
- ☐ Wine Cooler

**Home Media**
- ☐ Amplifier
- ☑ Cable Jacks *Comcast*
- ☐ Cable Receiver
- ☐ Cable Remotes
- ☐ Intercom System
- ☐ Internet HUB
- ☑ Internet Wiring
- ☑ Satellite Dish
- ☐ Satellite Receiver
- ☐ Speakers
- ☐ Speaker Wiring
- ☑ Switch Plate Covers

- ☐ Television (TV)
- ☐ TV Antenna
- ☐ TV Mounts/Brackets
- ☐ TV Wiring

**Interior Fixtures**
- ☐ Ceiling Fan
- ☐ Chandelier
- ☐ Closet System
- ☐ Fireplace (FP)
- ☐ FP Gas Logs
- ☐ FP Screen/Door
- ☐ FP Wood Burning Insert
- ☑ Light Bulbs
- ☑ Light Fixtures
- ☑ Mirrors *NO*
  - ☐ Wall Mirrors
  - ☐ Vanity (hanging) Mirrors
- ☐ Shelving Unit & System
- ☑ Shower Head/Sprayer
- ☑ Storage Unit/System
- ☑ Window Blinds (and *NO* Hardware)
- ☐ Window Shutters (and Hardware)
- ☐ Window Draperies (and Hardware)
- ☐ Unused Paint

**Landscaping / Yard**
- ☐ Arbor
- ☐ Awning
- ☐ Basketball Post and Goal

- ☐ Birdhouses
- ☐ Boat Dock
- ☐ Fence - Invisible
- ☐ Dog House
- ☐ Flag Pole
- ☐ Gazebo
- ☐ Irrigation System
- ☐ Landscaping Lights
- ☑ Mailbox
- ☐ Out/Storage Building
- ☐ Porch Swing
- ☐ Statuary
- ☐ Stepping Stones
- ☐ Swing Set
- ☐ Tree House
- ☐ Trellis
- ☐ Weather Vane

**Recreation**
- ☐ Gas Grill
- ☐ Hot Tub
- ☐ Outdoor Furniture
- ☐ Outdoor Playhouse
- ☐ Pool
- ☐ Pool Equipment
- ☐ Pool Chemicals
- ☐ Sauna

**Safety**
- ☐ Alarm System (Burglar)
- ☐ Alarm System (Smoke/Fire)
- ☐ Security Camera
- ☐ Carbon Monoxide Detector
- ☑ Doorbell
- ☐ Door & Window Hardware

- ☐ Fire Sprinkler System
- ☐ Gate
- ☐ Safe (Built-In)
- ☑ Smoke Detector
- ☐ Window Screens

**Systems**
- ☐ A/C Window Unit
- ☐ Air Purifier
- ☐ Whole House Fan
- ☐ Attic Ventilator Fan
- ☐ Ventilator Fan
- ☐ Dehumidifier
- ☐ Generator
- ☐ Humidifier
- ☐ Propane Tank
- ☐ Propane Fuel in Tank
- ☐ Fuel Oil Tank
- ☐ Fuel Oil in Tank
- ☐ Sewage Pump
- ☐ Solar Panel
- ☐ Sump Pump
- ☑ Thermostat
- ☐ Water Purification System
- ☐ Water Softener System
- ☐ Well Pump

**Other**
- ☐ _____
- ☐ _____
- ☐ _____
- ☐ _____
- ☐ _____

**Clarification Regarding Multiple Items.** Items identified above as remaining with Property where Seller is actually taking one or more of such items shall be identified below. For example, if "Refrigerator" is marked as staying with the Property, but Seller is taking the extra refrigerator in the basement, the extra refrigerator and its location shall be described below. This section shall control over any conflicting or inconsistent provisions contained elsewhere herein.

_____
_____
_____

**Items Needing Repair.** The following items remaining with Property are in need of repair or replacement:
*unknown*
_____
_____
_____

| RECEIPT AND ACKNOWLEDGEMENT BY BUYER | SELLER'S REPRESENTATION REGARDING THIS STATEMENT |
|---|---|
| Buyer acknowledges receipt of this Seller's Property Disclosure Statement. | Seller represents that the questions in this Statement have been answered to the actual knowledge and belief of all Sellers of the Property |
| *Elizabeth Ann Kapp*    dotloop verified 06/20/19 1:38 PM EDT EB2N-VMTO-FNZM-VKAF | /s/ Millard Farmer |
| 1 Buyer's Signature | 1 Seller's Signature |
| Elizabeth Kapp | Millard Farmer, Jr. |
| Print or Type Name | Print or Type Name |
| 06/20/2019 | 1/21/19 |
| Date | Date |
| | |
| 2 Buyer's Signature | 2 Seller's Signature |
| Print or Type Name | Print or Type Name |
| Date | Date |
| ☐ Additional Signature Page (F267) is attached. | ☐ Additional Signature Page (F267) is attached. |

# LEAD-BASED PAINT
## EXHIBIT "A_____"

Georgia REALTORS
2019 Printing

This Exhibit is part of the Agreement with an Offer Date of 06/20/2019 _____ for the purchase and sale or lease of that certain Property known as 1196 Dekalb Avenue NE, _____ Atlanta _____ Georgia 30307 _____

1. **Purchase and Sale or Lease Transaction Lead Warning Statement**
   Every purchaser or tenant of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller or Landlord of any interest in residential real property is required to provide the Buyer or Tenant with any information on lead-based paint hazards from risk assessments or inspections in the Seller's or Landlord's possession and notify the Buyer or Tenant of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

2. **Seller's/Landlord's Disclosure.** [initials]
   Initials of Seller / Landlord

   A. Presence of lead-based paint and/or lead paint hazard [check one below]:
      ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain below):
      _____
      ☒ Seller/Landlord has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
   B. Records and Reports available to the Seller/Landlord [check one below]:
      ☐ Seller/Landlord has provided the Buyer/Tenant with all the available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list document below):
      _____
      ☒ Seller/Landlord has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

3. **Buyer's/Tenant's Acknowledgment.** [initials]
   Initials of Buyer / Tenant

   A. Buyer/Tenant has received copies of all information, if any, listed above
   B. Buyer/Tenant has read and understands the above lead warning statement and has received the pamphlet "Protect Your Family from Lead in Your Home".
   C. Buyer/Tenant has [check one below]
      ☐ Received a ten (10) day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
      ☒ Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

4. **Broker's Acknowledgment.** [initials]
   Initials of Broker or Licensee of Broker

   Broker has informed the Seller/Landlord of the Seller's/Landlord's obligations under 42 U.S.C. § 4852(d) and is aware of his/her responsibility to ensure compliance.

5. **Certification of Accuracy.**
   The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| Buyer/Tenant Signature | Date | Seller/Landlord Signature | Date |
|---|---|---|---|
| 1 [signature] | [date] | 1 [signature] | [date] 2019 |
| 2 Buyer/Tenant Signature | Date | 2 Seller/Landlord Signature | Date |
| ☐ Additional Signature Page (F267/F931) is attached. | | ☐ Additional Signature Page (F267/F931) is attached. | |
| [signature] Selling/Leasing Broker | Date | [signature] Listing Broker | June 21, 2019 |

NOTE: It is the intent of this Exhibit that it be applicable to both the sale and leasing of Property. The use of terms like "Buyer/Tenant" shall mean either a Buyer or a Tenant or both as the context may indicate.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Melanie Smith IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2019 by Georgia Association of REALTORS®, Inc.                    F316, Lead-Based Paint Exhibit, 01/01/19